# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES DIAZ,<br><br>       Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Case No. 1:16-cv-01127-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING MATTER FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 17, 23, 24) |

## I.

## INTRODUCTION

Plaintiff James Diaz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from bladder and bowel incontinence, cervical degenerative disc disease, status post fusion of CS-6; lumbar degenerative disc disease with radiculopathy; obesity; left knee status post partial medial meniscectomy; status post fracture of the left little finger; and depression. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 11.)

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed a prior application in August 2009 that was allowed, but the reviewing agency reversed the favorable determination on the ground it was not supported by the evidence. (AR 17, 158-160, 161-165.)  Plaintiff filed a Title XVI application for supplemental security income on July 7, 2010, alleging disability beginning on August 20, 2007.  (AR 35.)  Plaintiff's application was initially denied on September 23, 2010, and denied upon reconsideration on May 1, 2013.  (AR 49-52, 53-57.)  Plaintiff requested and received a hearing before Administrative Law Judge Sharon L. Madsen ("the ALJ").  Plaintiff appeared for a hearing on September 25, 2014.  (AR 1151-1189.)  On November 21, 2014, the ALJ found that Plaintiff was not disabled. (AR 14-32.)  The Appeals Council denied Plaintiff's request for review on May 25, 2016.  (AR 8-10.)

### A.    Relevant Hearing Testimony

Plaintiff testified at a hearing on September 25, 2014.  (AR 1155-1174, 1175-1178.) Plaintiff was born on March 27, 1968.  (AR 1155.)  He was 5 foot 8 inches tall and weighed 220 pounds on the date of the hearing.  (AR 1155.)  Plaintiff is left handed.  (AR 1155.)  Plaintiff is divorced, has a 25 year old son, and lives in a house with a friend.  (AR 1155-1156, 1174.)  He completed eighth grade, and started the ninth grade but did not complete it.  (AR 1157.)  Plaintiff took some college units.  (AR 1157.)  He did not receive any vocational training.  (AR 1157.)

Plaintiff received a lump sum settlement on his worker's compensation claim and does not have continuing medical coverage.  (AR 1156.)

Plaintiff has a driver's license but does not drive very often.  (AR 1156.)  He is afraid to drive because he does not want to get a DUI from driving while taking his medication.  (AR 1174.)  Plaintiff needs help showering and dressing.  (AR 1157.)  Plaintiff's hands go numb and he does not have enough stability to stand.  (AR 1157.)  Plaintiff does not do any household chores or shopping.  (AR 1158.)  He will microwave soup and a sandwich.  (AR 1158.)  Plaintiff does not engage in any social activity.  (AR 1158.)

/ / /

Plaintiff spends his day resting on his back and his medication makes him sleepy. (AR 1158.) When Plaintiff wakes up, he lies in bed long enough to make sure his extremities are not numb. (AR 1158.) He takes his medication and then lies in bed long enough for them to take effect so he can move without too much pain. (AR 1158.) Plaintiff goes to the restroom, which he has to do a lot. (AR 1158.) Plaintiff lays out his clothing and then gets help showering and getting dressed. (AR 1158.) He usually wears a tank top, shorts, and flip flops. (AR 1158.) Plaintiff will rest in a prone position if he is having a bad day. (AR 1158-59.) If he is able, he will go into the living room and watch television sitting in a recliner. (AR 1159.) Plaintiff has a television in his bedroom. (AR 1159.) Plaintiff spends seven to eight hours a day lying down. (AR 1171.) On his worse days he will spend ten to twelve hours lying down. (AR 1172.) Plaintiff easily has four bad days a week. (AR 1172.)

Plaintiff worked for LP Denny in 1999. (AR 1159.) He was a driver and merchandiser delivering beer. (AR 1159.) He worked at Keegan Robertson overseeing shipping and receiving. (AR 1159-1160.) Plaintiff also would pull orders. (AR 1160.) Plaintiff worked in 2010 for Alamo Skilled Personnel. (AR 1160.) He would walk around checking fittings but only did that for about six weeks because his back would not let him do the work. (AR 1160.)

Plaintiff's neck pain is pretty much constant. (AR 1161.) His neck pain is made worse by looking down, walking, and sitting because his cane puts pressure on his shoulders. (AR 1161.) When his neck is bothering him, he put himself into a dark room because it brings on migraines. (AR 1161.) This happens about three to four times a week. (AR 1161-1162.) The migraines last about a day. (AR 1162.)

Plaintiff's back pain is constant. (AR 1162.) On bad days his legs feel like they are on fire, they go numb and burn, and will be unstable causing him to fall. (AR 1162.) Plaintiff will lie down with his feet elevated to take the pressure off his lower spine. (AR 1162.) The left leg is worse than the right and he has had three inches of atrophy in it. (AR 1162.) Plaintiff's right leg has spasms due to his left leg being so weak. (AR 1162.) The instability causes his right leg to balance itself. (AR 1162.)

/ / /

Plaintiff has been to the emergency room a few times since 2013 for treatment. (AR 1162-1163.) The doctors want to do a fusion and put a steel rod in his lower back but at his age it is so dangerous and they cannot guarantee that he will have use of his lower extremities afterwards. (AR 1163.) Plaintiff already suffers from incontinence and does not want to give up his legs. (AR 1163.) Plaintiff has incontinence daily. (AR 1163.) In a typical day he will go to the bathroom eight to ten times. (AR 1171.) Plaintiff will spend 15 to 20 minutes in the bathroom each time. (AR 1171.) For the hearing, Plaintiff did not eat and drank very little. (AR 1163.) It can be very embarrassing. (AR 1163.)

The meniscus is gone from Plaintiff's left knee and it is arthritic. (AR 1164.) He was told that he has bone fractures and bruising going down about eight inches into his lower leg. (AR 1164.) Plaintiff has constant pain in his leg and can predict the weather. (AR 1164.) His left knee is the one that mainly bothers him. (AR 1164.) His right leg also hurts and his ankles have nerve damage from his back. (AR 1164.) He feels like he sprained his ankles but the doctors tell him that it is his nerves that cause the feeling. (AR 1164.)

Plaintiff has to take medication for his stomach on a daily basis due the medication he takes for pain. (AR 1165.) Plaintiff has developed peptic ulcers and his medication causes either diarrhea or constipation. (AR 1165.) Plaintiff also takes medication for pain and anxiety. (AR 1165.) After Plaintiff takes his medicine at bedtime it takes twelve to thirteen hours to feel like he has some kind of clarity. (AR 1173.) It is only between four and eight o'clock that Plaintiff does not feel like he is medicated. (AR 1173.) Plaintiff feels foggy and it is hard to focus on the days he takes his pain medication on top of his other medications. (AR 1173-1174.)

Plaintiff is getting worse. (AR 1172.) He has started to have daily tremors throughout his body. (AR 1172.) The tremors are worse in his lower arms and hands. (AR 1173.) The tremors affect Plaintiff's ability to use his hands. (AR 1173.)

Plaintiff can lift a half gallon of milk. (AR 1166.) Plaintiff is able to stand less than 10 to 15 minutes with shifting and then has to sit down. (AR 1166.) Plaintiff can walk 10 to 15 paces before he has to rest. (AR 1167.) Plaintiff uses a walker in his house and a cane when he is out. (AR 1167.) His roommate is more like a caretaker and she helps him put on his shoes

and helps him in and out of the shower.  (AR 1167.)  Plaintiff is unable to climb stairs.  (AR 1167-1168.)  Plaintiff cannot lift his arms over his head because it pinches his shoulders.  (AR 1168.)  Plaintiff has broken his left hand and his hands are not nimble anymore.  (AR 1168.)  His hands burn and feel like they are on fire a lot.  (AR 1168.)

Plaintiff has problems with his right shoulder because the rotator cuff is ripped so he has arthritic pain and his shoulder wants to lock.  (AR 1170.)  The doctors have suggested surgery, but it is scary after his knee surgery.  (AR 1170-1171.)  If they take the cartilage out it would be just bone to bone and Plaintiff is not sure he can deal with it.  (AR 1171.)

Plaintiff gets irritated with people and will have violent outbursts.  (AR 1169.)  Plaintiff has social anxiety.  (AR 1169.)  He feels vulnerable being around people.  (AR 1169.)  Plaintiff just started taking medication.  (AR 1169.)  Plaintiff watches television for the background noise.  (AR 1169-1170.)  Plaintiff will be watching television and then wakes up and something else is on.  (AR 1170.)  Plaintiff is able to concentrate for ten to fifteen minutes at a time.  (AR 1173.)  Then, he has to take a break for a couple hours before he is able to concentrate again.  (AR 1173.)  Plaintiff is not able to manage his own funds because he does not remember to pay bills unless he is reminded.  (AR 1170.)

A vocational expert, Jose L. Chaparro, also testified at the hearing.  (AR 1174-1186.)

**B.**   **ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since July 7, 2010, the application date.

- Plaintiff has the following severe impairments: cervical degenerative disc disease, status post fusion of CS-6; lumbar degenerative disc disease with radiculopathy; obesity; left knee status post partial medial meniscectomy; status post fracture of the left little finger; and depression.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform sedentary work as defined in 20

5

CFR 416.967(a). Specifically, Plaintiff is able to lift and carry ten pounds occasionally and frequently. He is able to stand and/or walk for a total of two hours and sit for six to eight hours in an eight-hour workday. He needs a cane for ambulation. He is able to occasionally stoop, crouch, crawl, climb, kneel, and reach overhead. Mentally, Plaintiff is able to perform simple routine tasks with occasional public contact.

- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on March 27, 1968, and was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not the claimant has transferable job skills.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.
- Plaintiff has not been under a disability, as defined in the Social Security Act, since July 7, 2010, the date the application was filed.

(AR 19-32.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is

disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff brings this appeal arguing that the ALJ erred by failing to adequately consider whether Plaintiff's back impairment satisfied the criteria to meet or equal a listing; failing to evaluate all medical evidence; and failing to provide clear and convincing reasons to reject Plaintiff's testimony.

> **A.** **Finding that Plaintiff Presented No Evidence to Meet Listing 1.04 is not Supported by Substantial Evidence**

Plaintiff contends that the ALJ erroneously found that Plaintiff did not have an impairment that met Listing 1.04. Specifically, Plaintiff argues that the ALJ erred by finding that there is no evidence of nerve root compression because there is objective medical evidence that he has a disc bulge at L4-L5 that makes an impression upon the L5 nerve root and another disc bulge at L5-S1 that abuts the nerve roots.

Defendant responds that the ALJ properly determined that Plaintiff did not meet the listing requirement. Defendant argues that some of the criteria are met is not sufficient for Plaintiff to meet the listing requirements. Defendant argues that the ALJ correctly evaluated the evidence in determining that Plaintiff did not meet the listing.

Plaintiff counters that Defendant has not addressed the ALJ's failure to determine whether the evidence presented was sufficient to medically meet Listing 1.04 or the failure to consider if Plaintiff's medical conditions were medically equaled the impairment.

At step three, the Commissioner considers whether the claimant has an impairment, or combination of impairments, that meets or medical equals a listed impairment. Burch, 400 F.3d at 679. The Listing of Impairments describes the major body system impairments that are considered to be severe enough to prevent an individual for doing any gainful activity. 20 C.F.R. § 416.925(a). An impairment will be found to meet the requirements of the listing when it satisfies all of the criteria of the listing, including the introductory criteria, and meets the

8

durational requirement. 20 C.F.R. 416.925(c)(3). No matter how severe an impairment is, it does not qualify as equaling a listing where it manifests only some of the listing criteria. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

If the claimant has an impairment(s) that meet or medically equal a listed impairment which meets the durational requirement, he will be found disabled. 20 C.F.R. § 416.920(d); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990) (a conclusive presumption of disability applies). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001). However, the ALJ need not discuss the findings in any specific section of his opinion. Lewis, 236 F.3d at 513.

"If a claimant has more than one impairment, the Commissioner must determine 'whether the combination of [the] impairments is medically equal to any listed impairment.' " Lewis, 236 F.3d at 514 (quoting 20 C.F.R. § 404.1526(a)).[2] "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a claimant's impairment is not listed, then to the listed impairment 'most like' the claimant's impairment." Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1526)[3].

"The claimant's illnesses 'must be considered in combination and must not be fragmentized in evaluating their effects.' " Lester v. Chater, 81 F.3d 821, 829 (9th Cir. 1995), as amended (Apr. 9, 1996) (citations omitted). "In determining whether the claimant's combination of impairments equals a particular listing, the Commissioner must consider whether his 'symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria.' " Lester, 81 F.3d at 829 (quoting 20 C.F.R. § 404.1529(d)(3)).

[2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, however Plaintiff is seeking supplemental security income. The regulations cited are generally the same, however, are contained in different sections of the Code of Federal Regulations. Here, the relevant section is 20 C.F.R. § 416.920(a). Subsequent footnotes shall provide the appropriate section that applies in this case.

[3] 20 C.F.R. § 416.926.

Plaintiff argues that the ALJ erred in finding that he does not meet or equal the Listing Impairment 1.04 which sets forth the criteria for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  At issue here is section A of the listing.  To be found disabled at step three, Plaintiff had to establish that he met the following characteristics of Listing 1.04:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04.

The ALJ found that

> [Plaintiff's] spinal impairment does not meet or medically equal the criteria of section 1.04 in the Listing of Impairments.  The claimant has provided no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (muscle weakness or atrophy with associated muscle weakness) accompanied by sensory or reflex loss, and positive straight-leg raising test results in both the sitting and supine positions.

(AR 19.)

In the next step in the analysis the ALJ addressed the medical evidence.  The ALJ noted that a "lumbar spine MRI in April 2009 showed a left central paracentral disc herniation at L5-S1 abutting both S1 nerve roots in the lateral recess, and an L4-5 disc herniation abutting both L5 nerve roots in the lateral recess, but no significant central or foraminal stenosis."  (AR 22, 453.) In September 2009, Dr. Tisdall, who provided pain management, said that Plaintiff had four bulging discs and pinched sacroiliac nerves.  (AR 22, 524-525.)

Dr. Ravdel performed an orthopedic examination in June 2010 and review of the MRI of the lumbar spine from April 2010 showed disc herniation at multiple levels including a 3 mm posterior annular disc bulge at L2-3 which contacted the right L2 nerve root, disc herniation at L4-5 impinging and abutting both L5 nerve roots, and a 5 mm disc herniation at L5-S1 abutting the S1 nerve root.  (AR 22, 583.)  Although Defendant argues that there is no evidence of nerve root compression, Dr. Ravdel diagnosed herniated nucleus pulposus at L2-3, L3-4, L4-5, and L5-

S1 with L5-S1 radiculopathy secondary to nerve root compression; lumbar disco genic pain; and muscle wasting of the left lower extremity with positive straight leg raising. (AR 22, 583.) In September 2010, Dr. Lowry noted that the claimant continued to have pain on palpation of the lumbosacral area bilaterally and positive straight leg raising on the left, although motor strength of his lower extremities remained at 5/5+, and his gait was normal. (AR 23, 641.)

In February 2011, Plaintiff was examined by Dr. Woods who found tenderness in the lower thoracic spine and the lumbar spine with mild tenderness over the sciatic notches. (AR 23, 641.) Plaintiff had no paraspinous spasm and was able to heel-toe walk and do a full deep knee bend. (AR 23, 641.) Straight leg raising was negative seated, and supine straight leg raising was negative on the left and questionably positive on the right. (AR 23, 641.) Plaintiff had decreased sensation to the left leg. (AR 23, 641.) Plaintiff had atrophy of the left thigh and calf. (AR 23, 641.) Dr. Woods ordered an MRI that did not show the disc herniation at L5-S1, and only a mild disc bulge at L4-5. (AR 23, 677.) Dr. Woods noted that Plaintiff had some non-organic pain response with tremulous leg weakness on examination, but was able to heel and toe walk and do a squat. (AR 23, 651.)

Although the ALJ found that Plaintiff presented no evidence that he met Listing 1.04, there is objective medical evidence in the record that addresses each of the listing's section A criteria. Specifically, MRI results and nerve testing showed nerve root compression characterized by neuro-anatomic distribution of pain. (AR 453, 455-456, 583.) Examination of revealed limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and positive straight-leg raising tests. (AR 507, 509, 517, 519, 525, 583, 585, 594, 600, 603, 610, 1027, 1075, 1107.)

The ALJ's finding that Plaintiff had not presented evidence that he meet the listing requirement of 1.04 is not supported in the record. Accordingly, this action shall be remanded for the ALJ to consider whether Plaintiff has an impairment that meets or medically equals a listing impairment.

/ / /

/ / /

**B.    The ALJ Properly Considered Evidence of Plaintiff's Alleged Urinary and Bowel Incontinence**

Plaintiff argues that the ALJ erred by failing to consider medical evidence regarding his alleged urinary and bowel incontinence and failing to develop the record.  Defendant responds that the ALJ properly considered the medical evidence and that Plaintiff did not mention his alleged incontinence to the consultative examiner.  Further, Defendant contends that Plaintiff has not shown that he has work related limitations related to such incontinence.  Plaintiff replies that the record is replete with evidence of urinary and bowel incontinence; there is no indication that the ALJ even considered such evidence; and the ALJ did not even mention the incontinence in considering Plaintiff's serious impairments.

Plaintiff argues that the ALJ failed to address his incontinence at step two and failed to consider it.  At step two, the ALJ found that Plaintiff's cervical degenerative disc disease, status post fusion of CS-6; lumbar degenerative disc disease with radiculopathy; obesity; left knee status post partial medial meniscectomy; status post fracture of the left little finger; and depression were severe impairments because they significantly limit Plaintiff's ability to perform the physical and mental functions of work.  (AR 19.)   The ALJ did not address those impairments that were found to be not severe, however, any such error is harmless as the ALJ considered Plaintiff's urinary and bowel incontinence in developing the residual functional capacity.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).

In determining Plaintiff's residual functional capacity, the ALJ did consider that Plaintiff had been diagnosed with bladder and bowel incontinence.  (AR 24.)  Plaintiff was seen by Dr. Cantrell in August 2012 to evaluate his erectile dysfunction and incontinence issues.  (AR 24, 1077-1081.)  Dr. Cantrell's report states that Plaintiff was referred for the specific purpose of evaluating his erectile dysfunction and periodic urinary and fecal incontinence.  (AR 1077.)  Dr. Cantrell did not have the most recent MRI, but did review the April 2008 and April 29, 2009 MRIs.  (AR 1078.)  He noted that the April 29, 2009 MRI was interpreted as showing "1) Central left paracentral disc herniation at L5-S1 that abuts both S1 nerve roots in the lateral

recess; At L4-5, there is a broad-based disc herniation that abuts both L5 nerve roots in the lateral recess.  The body of the report, however, states that there is no nerve root compression." (AR 453, 1078.)

On examination, Dr. Cantrell found that Plaintiff had no paraspinal musculature nodularity or tenderness.  (AR 1079.)  The straight leg raise was easily negative to 90 degrees in a seated position on a simultaneous and individual basis and internal and external rotation of the limbs produced no complaint of pain.  (AR 1079.)

The entirety of Plaintiff's left lower limb appeared smaller than the right.  (AR 1079.) Plaintiff had a left sided limp and was able to stand on his heels and toes on the left side somewhat poorly.  (AR 1079.)  Individual muscle testing showed a significant lack of effort on toe extension and foot flexion.  (AR 1079.)  Dr. Cantrell stated that "Interestingly enough, however, his succession movements and rapid alternating movements are normal." (AR 1079.)

Plaintiff had a reproducible hypesthesia to pin prick over the left lateral leg.  (AR 1079.) Position testing was normal if the examiner used 2 cm excursions bilaterally.  (AR 1079.) Reflexes were 2+ on all major tendons.  (AR 1079.)

The ALJ specifically considered that Dr. Cantrell found Plaintiff to have fair rectal sphincteric tone and his bulbo-cavenosus reflex was present.  (AR 24, 1079.)  Dr. Cantrell said Plaintiff had low back pain, probably musculoskeletal; dysesthesias of both lower limbs, possibly neurogenic; intermittent urinary and fecal incontinence, probably non-neurogenic; and intermittent erectile dysfunction due to pain.  (AR 24, 1080.)  The ALJ also noted that at the February 4, 2013 consultative examination with Dr. Stoltz, Plaintiff did not mention erectile dysfunction or incontinence.  (AR 25, 876-881.)  Contrary to Plaintiff's argument, the ALJ did consider Plaintiff's urinary and bowel incontinence.

Plaintiff argues that the ALJ erred by failing to develop the record due to Plaintiff's incontinence.  When applying for disability benefits, the claimant has the duty to prove that he is disabled.  42 U.S.C. § 423(c)(5)(A).  The ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443

(9th Cir. 1983)).  The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).

The facts in this case are not similar to other instances in which the ALJ was found to have a duty to further develop the record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if claimants benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

The mere existence of an impairment is insufficient proof of a disability.  Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993.)  Here, the ALJ considered Plaintiff's urinary and bowel incontinence.  Although Plaintiff argues that the medical record is replete with evidence of his urinary and bowel incontinence, he does not point to any such evidence, and other than Plaintiff's subjective complaints which the ALJ properly found to be not credible as discussed below, the Court finds little objective medical evidence addressing Plaintiff's claims that he has urinary and bowel incontinence other than that cited by the ALJ in his opinion.  Further, no doctor opined that Plaintiff had any limitations related to his incontinence.

The ALJ properly considered Plaintiff's urinary and bowel incontinence in developing Plaintiff's residual functional capacity assessment.

///

///

## C.    The ALJ Provided Clear and Convincing Reasons to Discount Plaintiff's Testimony

Lastly, Plaintiff argues that the ALJ failed to provide clear and convincing reasons to discount his symptom testimony.  Specifically, Plaintiff contends that the ALJ improperly discounted his testimony because of inconsistent medical evidence; surgery was not performed; inconsistent statements regarding his workplace injury in 2007 and education; and his failure to comply with treatment.

Defendant replies that the ALJ gave multiple legally sufficient reasons to find his complaints not credible and even if the ALJ erred in evaluating one of the factors, the error would be harmless as the ALJ provided other proper reasons to reject Plaintiff's testimony.

Plaintiff replies that the "contradictory" statements relied on by the ALJ are not contradictory, and the objective medical evidence supports Plaintiff's complaints regarding the severity of his symptoms.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

In addressing Plaintiff's credibility, the ALJ stated the following:

> The claimant testified at the hearing to severe symptoms and limitations, but his testimony was not persuasive or convincing of a disabling impairment. The claimant testified that he has a driver's license and drives at times. He stated that he needs help showering and dressing because of neck pain, hand numbness, and instability. He said he does no housework or shopping, does not socialize, and microwaves food. The claimant testified that he lies down seven or eight hours a day, and 12 hours on his worst days. He said he has bad days four times a week.

> The claimant testified that he has constant neck pain that is worse when looking down. He stated he has constant low back pain that is worse when walking or sitting. He said his legs have a numb burning sensation. He said he has three inch atrophy of the left leg, and his right leg has spasms. The claimant testified that he has not had regular care since 2013, but used the emergency room. He said he has daily incontinence. He stated his left knee is missing the meniscus and is arthritic with constant pain. The claimant testified that he has nerve damage in his ankles from his back problems, and he has peptic ulcers that cause constipation. He said his right rotator cuff ripped. He said he has shaking throughout his body, mostly in the lower arms and hands.

> The claimant testified that he is able to lift a half gallon of milk at the most, sit and stand for 15 minutes each, and walk 15 steps. He stated he uses a cane outside and a walker at home. The claimant testified that he does not climb stairs, reach overhead with either arm, or pick up small objects with his left hand. He said depression causes anger and irritability around others. He stated he has violent outbursts and social anxiety.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The medical evidence does not support symptoms as severe as the claimant reports. Several doctors suggested lumbar surgery, but none was done. An MRI showed a lumbar disc herniation at L5-S1, but a subsequent MRI showed only mild degenerative disc disease at L4-5. Neurology specialist, Dr. Cantrell, found no spinal tenderness, negative straight leg raising, and significant lack of effort on the examination (Exhibit 56, p. 4). The consultative examination by Dr. Stoltz yielded inconsistencies and similar results (Exhibit 38F).

Dr. Woods, who performed a very thorough physical examination, observed that the claimant's history and the areas he claimed to be injured were not consistent with the medical evidence (Exhibit 25F, p. 17). In addition, Dr. Woods noted the claimant's description of the industrial accident varied from doctor to doctor. The claimant told Dr. Woods a compressor fell on his left hand, knocked him down, and landed on him. However, in the first report of injury the claimant did not mention a fall onto his buttocks, knees, or left hand. The first report indicated the claimant was trying to put a compressor into a box. Another report said the claimant was moving a compressor when his back started hurting. The claimant later said he lifted a propane tank and had back pain, and subsequently had his left hand crushed when lifting a compressor. Considering that Dr. Woods reviewed the entire medical file in discovering the discrepancies, I find they seriously diminish the claimant's credibility.

Dr. Woods noted the claimant had non-organic pain response, but said the claimant was able to do a full squat and perform heel and toe walking. He also noted that the disc herniation shown in prior MRIs was no longer present (Exhibit 25F, p. 17). Dr. Najafi also noted normal range of motion of the lumbar spine and the ability to squat and heel and toe walk (Exhibit 39F). However, when the claimant first saw his new doctor, Dr. Lewis, he was unable to heel or toe walk, but there are no records to show worsening of his condition in the interim.

The record shows the claimant repeatedly failed to pick up his prescription medication, indicating his pain was not as severe as he alleged.

The claimant testified that he completed 9th grade, but told Dr. Michiel he received his GED in 1986 (Exhibit 37F, p. 3). In his Disability Report, the claimant said he completed three years of college (Exhibit 2E, p. 3).

Thus, because the objective evidence does not support disabling impairments, and because of the many inconsistencies in the record and testimony, I give little weight to the claimant's subjective complaints.

(AR 29-30.)

1. <u>Inconsistent Statements</u>

The ALJ considered that Plaintiff made inconsistent statements regarding his educational background and how his work related injury occurred in finding Plaintiff's testimony not

credible.

**a.     Work Related Injury**

The ALJ noted the April 1, 2011 report of Dr. Woods who performed an agreed medical examination in which Plaintiff stated that "on August 20, 2007, while working for Keegan & Robertson as a Warehouse Supervisor, he injured his lumbar spine when he was moving a pallet with a 228-pound compressor on it.  The compressor fell over onto his left hand; however, the momentum of the compressor knocked him down.  He fell back landing on his buttocks and lumbar spine on the concrete with compressor on top of him.  He was able to push the compressor off of his body; however, he felt immediate pain in his lumbar spine and he felt numbness in the upper portion of his back and left hand." (AR 631.)  In addressing causation, Dr. Woods found:

> Causation is a complicated issue due to the fact Mr. Diaz's stated history and areas injured do not match the medical records submitted.  Based on my review of the records, the August 20, 2007 date of injury is documented as being an injury to the lumbar spine.  Although on examination today Mr. Diaz indicates that he injured his lumbar spine when moving a pallet and the compressor fell over onto his left hand, then knocked him down and he fell back landing on his buttocks with the compressor on top of him.  This mechanism of injury is significantly different than the mechanism of injury provided in the two different Doctor's First Reports of Injury.  Specifically, there is no indication of a fall onto his buttocks or onto his knees.  There is also no documentation of a specific injury to the left hand with this injury.  Rather, the Doctor's First Report indicates that he was trying to put a compressor in a box and noted the onset of pain.  The August 29, 2007, Doctor's First Report noted he was moving a compressor and he had a twisting movement down the back, which caused the back pain.  None of the contemporaneous records indicated that he actually fell with the compressor.  Then in Dr. Grames October 16, 2007 report, his history somewhat evolved in that Dr. Grames noted what appeared to be two separate incidents, one where he lifted a propane tank, approximately 50-pounds, off a forklift and had minor back pain.  Then he states he was lifting a compressor from a pallet in a squatting position and the compressor fell crushing the left hand.  He moved the compressor off the hand and felt sharp numbing pain in the low back..  Therefore, it appears he added the hand injury in October 2007.  It does not appear Dr. Grames actually treated him for his hand but rather focused on the lumbar spine.  I do not see that x-rays of the left hand were obtained by Dr. Grames.  The patient subsequently treated following this 2007 injury.
> . . .
>
> When Mr. Diaz began treating with Dr. Zeitlin on July 9, 2008, he was complaining of urinary incontinence as well as Dr. Zeitlin stating he was showing significant bilateral foot drop due to his lumbar injuries.  Up to that point, the MRI scans did not appear to support such significant findings on physical examination.  Then in Dr. Zeitlin's July 30, 2008 report, Mr. Diaz returned indicating that he was doing much worse since his last office visit.  It was noted

he had left hand pain and mid and low back pain with hip pain. He had a splint on the left hand. It was noted that his legs buckled under him and he had fallen, fracturing two fingers. At that time, Dr. Zeitlin did not indicate that Mr. Diaz fell onto his left knee. On examination today, Mr. Diaz is claiming that the July 27, 2008 injury, which occurred at home when he fell forward onto the left knee and left hand on the carpet and had immediate pain in the left hand and left little finger. He also claimed increased low back complaints. Based on the original reporting of Dr. Zeitlin, there did not appear any reporting of left knee complaints as a direct result of that fall. There was, however, increased low back pain extending up into the thoracic spine, although he had previously reported those symptoms.

According to Mr. Diaz's history, he presented to the emergency room at Connelly Hospital in Floresville, Texas. He states that he reported his left knee symptoms to the hospital who told him that there might be a tear in his knee as well as a left hand fracture. I do not have those records available to confirm Mr. Diaz's stated history. On reviewing the records from Dr. Nielson, who subsequently treated Mr. Diaz for the left little finger fracture, on August 29, 2008 Dr. Nielson reported that Mr. Diaz was being referred to him for his left hand fracture. Dr. Nielson noted the low back pain and the left hand pain but did not take a history of left knee complaints. It was not until Dr. Nielson began treating Mr. Diaz in November 2008 and documented left knee pain with probable internal derangement that he opined that the left knee was originally a compensatory injury and it was reasonable to assume that the injury to the knee was caused by the initial injury to his back. However, I would respectfully disagree. It appeared Mr. Diaz, in hindsight, added the left knee complaints, as they were not previously part of his claim. It appears Dr. Nielson was the first one to document this in November 2008. This delay in onset would not reasonably be related to that specific injury.

(AR 647-648.)

Dr. Woods finding that Plaintiff added his left hand and knee complaints to his work related claim based on injuries that occurred after his work related injury support the ALJ's conclusion that Plaintiff made inconsistent statements regarding his work related injury that severely diminish his credibility. (AR 29.)

**b.     Education**

The ALJ also considered that during the September 25, 2014 hearing Plaintiff testified that he completed eighth grade and started the ninth grade but did not complete it. (AR 29, 1157.) Plaintiff told Dr. Michiel during his psychiatric evaluation that he graduated from high school and took some college units. (AR 29, 871.) Further in his disability report, Plaintiff stated that he completed three years of college. (AR 29, 127.) Plaintiff argues that his statement that he completed three years of college is not inconsistent with his statement that he only attended high school into the ninth grade. However, Plaintiff's testimony at the hearing that he

only started the ninth grade and did not go further in high school is inconsistent with his statement to Dr. Michiel that he graduated from high school.

In assessing a claimant's credibility, the ALJ is entitled to use "ordinary techniques of credibility evaluation, such as a claimant's reputation for truthfulness and any inconsistent statements in [his] testimony." Tonapetyan, 242 F.3d at 1148. The ALJ's finding that Plaintiff made inconsistent statements regarding his educational background is supported by substantial evidence in the record.

### 2. Medication

The ALJ also found that the record shows that Plaintiff repeatedly failed to pick up his medication which indicates that his pain was not as severe as he alleged. (AR 29.) In discussing the medical evidence, the ALJ found that Dr. Ravdel noted on September 21, 2010, that Plaintiff had not picked up prescriptions. (AR 22.) In June 2010, Plaintiff told his doctor that he wanted to reduce the medication he was taking and had refused his prescription the prior visit and discontinued Lyrica on his own. (AR 23.) The ALJ also noted that drug test results were negative for his prescribed medication in May 2012. (AR 24.)

Plaintiff argues that there is only one occasion in the record where Plaintiff was unable to pick up his medication because the insurer did not authorize it. Plaintiff references an April 30, 2013 note by Dr. Lewis that Plaintiff was denied his Tizanidine. (AR 1107.) However, the records cited by the ALJ did not include this incident.

The incidents relied on by the ALJ are a September 21, 2010, note in Dr. Ravdel's records that it was verified with the pharmacy that Plaintiff did not pick up the medication that had been prescribed. (AR 22, 579.) On September 21, 2010, Plaintiff confirmed that he did not pick up the medication that was called in for him the first week of August by Dr. Ravdel. (AR 591.) The ALJ also noted that on June 14, 2010, the record notes that Plaintiff was tied on Lyrica but he discontinued it. (AR 23, 595.)

The ALJ also found evidence that Plaintiff had drug tests that did not show the presence of his prescribed medication. (AR 24, 840, 1134.) Plaintiff argues that Dr. Lewis noted in his records that the laboratory tests to monitor compliance with pharmacological regime was

positive. Dr. Lewis' report indicates that the testing was done to monitor compliance with his medical regime as well as to identify any possible drug interactions related to multiple prescribing physicians. (AR 837.) Plaintiff's urine was tested for "opiates, oxycodones, methadone, benzodiazepines, barbiturates, propoxyphene, meprobamate, zolpidem, as well as the narcotics listed below in the report. The test also included the illicit drugs of phencyclidine (PCP), cocaine, marijuana, amphetamines, and MDMA." (AR 837.) Dr. Lewis stated that the "[u]rine drug testing (UDT) is used to assist in monitoring adherence to a prescription drug treatment regimen (including controlled substances), to diagnose substance abuse or misuse, addiction and/or other aberrant drug-related behavior to guide treatment, and to advocate for patients." (AR 837.) Although Dr. Lewis noted that the test was positive, review of the lab results shows that his prescribed medications were not present in his urine. (AR 840.) The ALJ rationally concluded that if Plaintiff's pain was a severe as he alleged, Plaintiff would be taking his prescribed pain medication.

The ALJ properly considered that Plaintiff's allegations of disabling pain were not consistent with his failure to follow a prescribed course of treatment. Tommasetti, 533 F.3d at 1039. Substantial evidence supports the ALJ's finding that Plaintiff was not complaint with his medication regime.

### 3. Objective Medical Evidence

Plaintiff contends that the ALJ erred in discrediting his complaints based upon the lack of objective medical evidence because there are objective findings to support his complaints. However, the ALJ noted that while there was an MRI that showed a lumbar disc herniation at L5-S1, a subsequent MRI showed only mild degenerative disc disease at L4-5 and on examination Dr. Cantrell found no spinal tenderness and negative straight leg raise and Dr. Stoltz examination yield similar results. (AR 29.)

While Plaintiff's April 2010 MRI showed disc herniation at multiple levels including a 3 mm posterior annular disc bulge at L2-3 which contacted the right L2 nerve root, disc herniation at L4-5 impinging and abutting both L5 nerve roots, and a 5 mm disc herniation at L5-S1 abutting the S1 nerve root (AR 583), Dr. Woods noted on February 11, 2011, that the current

MRI did not show the disc herniation which was previously seen at L5-S1 and there was a mild bulge at L4-L5. (AR 650.)

The ALJ considered that Dr. Woods performed a very thorough examination of Plaintiff on February 11, 2011, and noted that Plaintiff had a non-organic pain response, but he was able to do a full squat and perform heel to toe walking and noted that the disc herniation in the prior MRIs was not present. (AR 29, 641, 650.)

On August 21, 2012, Dr. Cantrell examined Plaintiff and found that Plaintiff had no paraspinal musculature nodularity or tenderness. (AR 29, 1079.) Straight leg raise was easily negative to 90 degrees in a seated position on a simultaneous and individual basis. (AR 1079.) Internal and external rotation of the limbs produced no complaint of pain. (AR 1079.) Dr. Cantrell also noted that while Plaintiff's left lower limb does appear somewhat smaller than the right, he did have good strength in his lower extremities and his reflexes in the lower limbs were normal. (AR 1080.)

Similarly, on February 4, 2013, Plaintiff was examined by Dr. Stoltz who found that while Plaintiff at times appeared uncomfortable in the seated position and was trying to find a better position, in the seated position Plaintiff did not have any back pain whatsoever with knee extensions. (AR 29, 879.) In the supine position he had negative straight leg raising signs. (AR 879.) Plaintiff had no findings whatsoever with straight leg raising or in a seated position. (AR 881.) Plaintiff had no direct spinal tenderness when standing. (AR 879.) Plaintiff had good motor tone bilaterally with good active motion. (AR 879.) His strength was 5/5 in all extremities, and sensory was grossly intact. (AR 879.) Plaintiff's reflexes were normal and symmetric bilaterally at 2+ with no clonus. (AR 879.) Dr. Stoltz noted that Plaintiff walked easily in the examination room without the use of any assistive device but had an almost imperceptible limp on the left. (AR 880.)

On September 24, 2013, Dr. Lewis noted that Plaintiff had an upright posture and a non-antalgic gait and he was able to get in and out of the chair in the exam room. (AR 1084.) Plaintiff had negative paraspinal tenderness to percussion. (AR 1084.) The record states "Pain complaints are worsening. Physical exam is improving." (AR 1084.)

Although an ALJ cannot make an adverse credibility determination solely based upon the lack of medical evidence, it is a factor that the ALJ can consider. Burch, 400 F.3d at 681. Substantial evidence supports the ALJ's findings that Plaintiff's complaints of disabling pain are not supported by the objective evidence in the medical record.

4.    Findings of Lack of Effort

The ALJ also considered that both Dr. Cantrell and Dr. Stoltz found that Plaintiff demonstrated significant lack of effort on examination. (AR 29.) On August 21, 2012, Dr. Cantrell noted, "Individual muscle testing shows a significant lack of effort on toe extension and foot flexion. Interestingly enough however, his succession movement and rapid alternating movements are normal." (AR 1079.)

On February 4, 2013, Dr. Stoltz noted that Plaintiff "showed very little effort whatsoever for forward flexion and was only able to forward flex at about 10 degrees with very little extension." (AR 879.) Dr. Stoltz opined that Plaintiff had very inconsistent physical exam findings on the visit. (AR 881.) As mentioned in his report, Plaintiff showed very little effort with range of motion of the back while standing but yet had no findings whatsoever with straight leg raising or in a seated position. (AR 881.)

A claimant's efforts to impede accurate testing of his limitations supports the ALJ's determination as to his lack of credibility. Thomas, 278 F.3d at 959. There is substantial evidence in the record to support the ALJ's finding that Plaintiff demonstrated significant lack of effort on physical examination.

5.    The ALJ Provided Clear and Convincing Reasons for Credibility Determination

Plaintiff argues that the ALJ gave unpersuasive reasons such as the fact that Plaintiff did not have surgery which was because his worker's compensation insurance carrier did not authorize payment for the surgery. To the extent that the ALJ erred in other reasons stated to reject Plaintiff's credibility, it would be harmless error as the ALJ provided other clear and convincing reasons for the adverse credibility finding. Batson, 359 F.3d at 1197.

The ALJ provided clear and convincing reasons that are supported by substantial evidence in the record to find that Plaintiff's symptom complaints were not credible.

## D.  Remand for Further Proceedings

Plaintiff seeks remand for further proceedings.  The ordinary remand rule provides that when "the record before the agency does not support the agency action, . . . the agency has not considered all relevant factors, or ... the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014).  This applies equally in Social Security cases.  Treichler, 775 F.3d at 1099.  Under the Social Security Act "courts are empowered to affirm, modify, or reverse a decision by the Commissioner '*with or without remanding the cause for a rehearing.*' "  Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. § 405(g)).  The decision to remand for benefits is discretionary.  Treichler, 775 F.3d at 1100.  In Social Security cases, courts generally remand with instructions to calculate and award benefits when it is clear from the record that the claimant is entitled to benefits.  Garrison, 759 F.3d at 1019.

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  Garrison, 759 F.3d at 1020.  The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.  Id. at 1021.  Even when the circumstances are present to remand for benefits, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in our discretion."  Treichler. 775 F.3d at 1102 (quoting Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989)).

In this instance, the ALJ erred in finding that Plaintiff had not presented evidence that he

meet the listing requirement of 1.04, but the ALJ also noted the inconsistent findings in the record and that objective evidence demonstrated that Plaintiff had significant improvement in his condition. (AR 21-26.) Therefore, the Court finds that this action should be remanded for the ALJ to determine whether Plaintiff has presented evidence to demonstrate that his impairments meet or equal listing 1.04.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in considering Plaintiff's incontinence and provided clear and convincing reasons for the adverse credibility finding. However, the ALJ erred by finding that Plaintiff presented no evidence that he met the listing requirement of 1.04. Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART, and this action is remanded for further proceedings consistent with this order. It is FURTHER ORDERED that judgment be entered in favor of Plaintiff James Diaz and against Defendant Commissioner of Social Security. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:  __**September 8, 2017**__                          _____

UNITED STATES MAGISTRATE JUDGE